IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                              Plaintiff,

        v.

ROBERT M. TRIGGS,

                              Defendant.

OPINION and ORDER

16-cr-51-jdp

Defendant Robert Triggs is charged with possession of firearms after having been convicted of a misdemeanor crime of domestic violence, in violation of 18 U.S.C. § 922(g)(9). Triggs moves to dismiss the indictment, contending that § 922(g)(9) violates his rights under the Second Amendment. Dkt. 15.

The Seventh Circuit has already upheld § 922(g)(9) against a facial challenge. *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010). The court applied intermediate scrutiny and concluded that dispossessing those who have been convicted of misdemeanor crimes of domestic violence is substantially related to the important governmental objective of preventing armed violence. But the last two sentences of the court's opinion left an opening for a potential as-applied challenge: "Whether a misdemeanant who has been law abiding for an extended period must be allowed to carry guns again, even if he cannot satisfy § 921(a)(33)(B)(ii), is a question not presented today. There will be time enough to consider that subject when it arises." *Id*. at 645.

Seeking to take advantage of the opening left by the court of appeals, Triggs contends that § 922(g)(9) is unconstitutional as applied to him. The court held an evidentiary hearing

(the transcript is Dkt. 22), and the parties submitted extensive post-hearing briefs (Dkt. 23, Dkt. 24, and Dkt. 30).

The Seventh Circuit has not set out a comprehensive framework for evaluating as-applied challenges to the various sections of § 922(g), and there is no consensus among the other circuits either. But following the Seventh Circuit's general approach to Second Amendment challenges, I must assume that, despite his convictions, Triggs has rights under the Second Amendment. Although § 922(g)(9) is a presumptively lawful categorical restriction on firearm possession, and one that has already passed facial review, that statute impairs rights at the core of the interests protected by the Second Amendment because it prohibits the possession of any firearm for any purpose.

So the government has the burden to show that its application of § 922(g)(9) to Triggs is substantially related to the important interest of preventing gun violence. The Seventh Circuit has not expressly explained what it would take to meet that burden or what evidence a district court can consider on the issue. But *Skoien* and *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010), suggest that the government's burden can be met by showing that the defendant's criminal history involves violent crimes, and that a district court can consider the actual conduct underlying the defendant's convictions.

Under that standard, the government has met its burden. Triggs's criminal history includes two convictions for domestic violence, one of which involved choking his victim. Following the example of the defendant in *Skoien*, those two convictions alone would be sufficient to justify the application of § 922(g)(9) over a Second Amendment objection. But there is more. Triggs's criminal history, which continues to 2015, includes other violent and dangerous conduct, including an assault on his girlfriend's sister. Even though Trigg's ample

criminal history includes no felonies, it shows that he poses an elevated risk of violence, and therefore the Second Amendment is not a bar to his prosecution. I will deny his motion to dismiss the indictment.

BACKGROUND

There is surprisingly little guidance regarding what facts and evidence a court may consider in the context of a motion to dismiss like Triggs's. Both sides here assume that the court may find facts about Triggs's criminal history and his conduct to determine whether he presents an elevated risk of gun violence. The parties dispute whether the evidence must be admissible under the Federal Rules of Evidence, an issue I discuss in the analysis section. At this point, I will set out the evidence that was presented to the court, and I'll explain how I'll consider it in the analysis section.

As detailed in the pretrial services report, Dkt. 11, from 2003 to 2012, Robert Triggs accumulated multiple arrests, served several terms of probation, and was jailed twice. Two of his misdemeanor convictions disqualify him from firearm possession: a 2003 conviction for disorderly conduct, which included a $50 assessment for domestic abuse (Dkt. 21-7); and a 2008 conviction for battery as an act of domestic abuse (Dkt. 21-1).

The federal gun charge at issue here arises from an incident in November 2015, which was described at the evidentiary hearing by Tomah police officer Aaron Hintz. Triggs's oldest son and his friends made comments on social media about shooting a teacher, and Tomah police were asked to investigate the incident. Triggs was called to the school, and Officer Hintz was assigned to account for any firearms in the homes of the students. Triggs acknowledged to Hintz that he possessed guns, and he agreed that Hintz could check the guns at the Triggs

home. On the way, Hintz checked Triggs's record and determined that he might be prohibited from possessing firearms as a result of the 2008 domestic battery conviction. Hintz found Triggs's three long guns in the Triggs living room, hanging unsecured and unlocked on a gun rack. Ammunition was on the bottom shelf of the gun rack, also unsecured. Hintz asked Triggs whether he had ever tried to purchase a firearm since his 2008 conviction. Triggs told him that about three years earlier he had tried to purchase a gun but was denied. After confirming Triggs's disqualifying conviction, Hintz removed the firearms from the home, and the case was referred to the U.S. Attorney for prosecution.

Officer Hintz also summarized his history of contact with Triggs. Hintz testified that in his first five years on the job at the Tomah police force, from 2005 to 2010, he had approximately 12 contacts with Triggs and that he had arrested Triggs for criminal traffic offenses, on warrants, and on probation holds and violations.

At the hearing, Triggs called his ex-wife and his current wife to put his criminal history in context. Triggs's ex-wife, Candy Donoho, testified to the trajectory of their relationship: they began dating in high school around 1995, became engaged in 1999, and married in 2000. They have two children, ages 15 and 11 at the time of the hearing. They had one separation during their marriage for about six months and ultimately divorced in 2005. They share joint custody and placement of the two children. Donoho described Triggs as a good father, and an avid deer hunter with both a rifle and bow. Donoho said that she never saw Triggs misuse a firearm.

Donoho described the incident that led to the 2003 conviction, which occurred during their separation. Triggs came to Donoho's home at bar time; he was drunk. Triggs wanted to get back together but Donoho did not. Donoho described the incident as follows:

> I don't remember all the details, but I know that he kind of got in my face. He wasn't like trying to hurt me, but he was just trying

> to make me, like, realize he was hurting and he wanted to be back
> and be a family again. He kind of backed me into a corner, and I
> just kind of, like, pushed him, and then I punched him twice
> and—in hopes that that would have knocked him out just so he
> could go to sleep and, like, think about it the next day, like, when
> he was sober, we could talk about things. I just knew he wasn't in
> the right state of mind to even have, like, that discussion at that
> time.

Dkt. 22, at 26.

Donoho's cell phone was damaged; Donoho said she dropped it. A police officer arrived on the scene (apparently a neighbor called because he heard yelling). Donoho told police what happened and Triggs was arrested. Despite this incident, Donoho testified that she never felt unsafe with Triggs and she believes that the kids are safe as well. The government provided the judgment of conviction, Dkt. 21-7, the original criminal complaint, Dkt. 21-5, and the amended criminal complaint, Dkt. 21-6. According to the description of the incident in the original complaint, Donoho told the officers that Triggs had thrown and broken two phones.[1]

Triggs also called his current wife, Rebecca. She described their relationship: they met in 2012, became engaged in 2014, and married in July of 2015. They own a home in Tomah where they raise Triggs's children from his marriage with Donoho, another child of Triggs from another relationship, and Rebecca's child. Rebecca confirmed that Triggs is an avid deer hunter and a passionate outdoorsman. Rebecca herself has been the victim of domestic violence and currently works as a domestic violence and sexual assault advocate for the Ho-Chunk Nation. She testified that she feels safe in the home with Triggs, that he has never engaged in any

---

[1] The criminal complaint also stated that Donoho "appeared to be upset and had been crying. When asked if everything was ok, [Donoho] said no and pointed to" Triggs. Dkt. 21-5. At the hearing, Donoho stated that she didn't remember that happening. Dkt. 22, at 27.

physical contact motivated by anger with her, and that she has never seen him misuse any firearm.

The last witness was Wilbert Steinborn, the police officer who investigated the incident that became Triggs's 2015 conviction for disorderly conduct. Steinborn's testimony was consistent with the criminal complaint, which stated that Triggs had gotten into a running dispute with a woman who worked near his home and parked her car on the public street in front of Triggs's house. The dispute escalated to an angry confrontation and Triggs was charged with disorderly conduct and damaging the woman's car. Triggs denied causing the damage, but ultimately he pleaded guilty to a count of disorderly conduct and the criminal damage charge was dismissed but read in, which means that that conduct could be considered in sentencing. (The case had not been resolved at the time of the hearing, but information about the plea is available on the CCAP record of *State of Wisconsin v. Robert M. Triggs, Jr.*, Monroe County Case No. 2016CM442.)

The government submitted documentary evidence to prove Triggs's other convictions, including his 2008 domestic abuse conviction. I will discuss that evidence later in the opinion.

ANALYSIS

In *D.C. v. Heller*, the Supreme Court held that the Second Amendment secures a personal right to keep and bear arms, based on the Court's analysis of the text and historical meaning of the amendment. 554 U.S. 570 (2008). But like other constitutional rights, the right to bear arms is not unlimited. One oft-cited passage concerning those limits is particularly significant to our purposes here:

> Although we do not undertake an exhaustive historical analysis
> today of the full scope of the Second Amendment, nothing in our

> opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*., at 626-27. *Heller* identified these "presumptively lawful" prohibitions as examples, not an exhaustive list. *Id*., 627 n.26.

Federal law makes it a crime for many categories of persons, not just felons, to receive, possess, or transport any firearm or ammunition. 18 U.S.C. § 922(g). One category dispossessed by § 922(g) is anyone "who has been convicted in any court of a misdemeanor crime of domestic violence." § 922(g)(9). "Misdemeanor crime of domestic violence" is defined to include any misdemeanor that:

> has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

18 U.S.C. § 921(33)(A)(ii).

Triggs concedes that he has been convicted twice of misdemeanor crimes of domestic violence, and thus under the plain terms of § 922(g)(9) it is a federal crime for him to possess a firearm or ammunition for any purpose. Triggs also acknowledges that, in *Skoien*, the Seventh Circuit held that § 922(g)(9) was facially constitutional as a permissible categorical disqualification from firearm possession of the type recognized as presumptively lawful under *Heller*. But *Skoien* explicitly left unanswered the question whether § 922(g)(9) might be vulnerable to an as-applied challenge. Triggs brings that as-applied challenge in this case with his motion to dismiss the indictment.

## A. The Second Amendment analytical framework

Triggs's motion raises difficult questions because neither *Skoien* nor any other Seventh Circuit opinion clearly sets out a comprehensive framework for evaluating as-applied challenges to § 922(g)(9), or to any restriction on firearm possession. And there is no consensus in the federal judiciary either. Courts have adopted different tests for deciding as-applied challenges in the Second Amendment context, and, even within a particular court, individual judges do not always employ the same method. *See, e.g., Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336 (3d Cir. 2016), *cert. denied sub nom. Sessions v. Binderup*, 137 S. Ct. 2323 (2017), *and cert. denied sub nom. Binderup v. Sessions*, 137 S. Ct. 2323 (2017); *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016).

There is some consensus on a two-step test that applies to Second Amendment challenges to firearm restrictions, and the Seventh Circuit has embraced a version of the two-step approach. *Ezell v. City of Chicago*, 846 F.3d 888 (7th Cir. 2017); *see also Tyler*, 837 F.3d at 685 (citing the several circuits that follow the two-step approach). The first step is a textual and historical analysis in which the court must determine if the challenged restriction covers conduct falling within the scope of the Second Amendment as it was originally understood. *Ezell,* 846 F.3d at 892. If it does not, then the government is free to regulate that conduct, and the Second Amendment analysis is over. *Id*. But if the restriction applies to conduct within the original scope of the amendment—or if the historical evidence is indeterminate—then there is second step. *Id*. Specifically, the restriction must satisfy some level of heighted scrutiny more searching than rational basis review. *Id*. "The rigor of this means–end review depends on 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.'" *Id*. (*quoting Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

*Skoien* did not precisely follow the two-step approach as set out in *Ezell*.[2] The court did not conduct its own textual–historical analysis, but rather drew from *Heller* the general principle that some categorical restrictions on the right to possess firearms are presumptively lawful and could withstand constitutional review. And such a review would necessarily be more searching than rational–basis review. The *Skoien* court did not delve deeply into the level of scrutiny question, because the court reasoned that "no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective. Both logic and data establish a substantial relation between § 922(g)(9) and this objective." 614 F.3d at 642. In the heart of the court's analysis, the court reviewed social science literature concerning domestic violence and firearms, and it concluded that three propositions were well-supported: domestic abusers commit acts that would be charged as felonies if not for the domestic relationship with the victim; firearms are deadly in domestic disputes; and persons convicted of domestic violence are likely to offend again. *Id.* at 643. The court concluded that these three propositions demonstrated the required substantial relationship between preventing armed violence and the dispossession of those convicted of misdemeanor crimes of domestic violence.

In subsequent cases considering Second Amendment challenges to § 922(g), the court of appeals has taken the same approach as *Skoien*, skipping the textual–historical analysis and

---

[2] *Skoien* was an *en banc* decision reversing an original panel decision, *United States v. Skoien*, 587 F.3d 803 (7th Cir. 2009). The original panel decision applied the two–step Second Amendment analysis, and in light of this analysis it concluded that the government had not sustained its burden to show a "reasonable fit" between the important objective of preventing armed violence and the dispossession of domestic-violence misdemeanants. The panel would have remanded for further proceedings in the district court. Judge Sykes dissented from the *en banc* opinion in part because she believed that it gave short shrift to the historical analysis in *Heller*. *Skoien* is the only *en banc* decision in which the court of appeals has considered a Second Amendment challenge since *Heller*.

moving directly to the intermediate scrutiny analysis. The reason is relatively simple: the Seventh Circuit has found that the founding–era evidence concerning firearm dispossession is inconclusive. As the court observed in *States v. Yancey*, "scholars continue to debate the evidence of historical precedent for prohibiting criminals from carrying arms." 621 F.3d 681, 684–85 (7th Cir. 2010). *Baer v. Lynch* provides a more recent statement of the same point. 636 F. App'x 695, 698 (7th Cir. 2016). No Seventh Circuit decision has held that the government has sustained its burden at step one—even with respect to violent felons. *See United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). So, at least in § 922(g) dispossession cases, the result of the step one historical analysis is foreordained, and the meat of the analysis is at step two, where the question is whether the dispossession can withstand intermediate scrutiny. Some other circuits have taken the same approach, applying intermediate scrutiny after concluding that the historical evidence is ambiguous. *See, e.g., Tyler,* 837 F.3d 678; *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013).

That should resolve the question of the basic framework to apply, but Triggs encourages the court to consider the approach taken by Judge Hardiman's concurrence in *Binderup*, which concerned an as-applied challenge to § 922(g)(1), the felon–prohibition section. Hardiman did not accept that the historical record regarding the original scope of the Second Amendment was "inconclusive at best." *Binderup*, 836 F.3d at 368–69 (citing *Skoien*, 614 F.3d. at 650 (Sykes, J., dissenting)). Instead, Hardiman saw a "common thread running through the words and actions of the Founders," which was that "the public understanding of the scope of the Second Amendment was tethered to the principle that the Constitution permitted the dispossession of persons who demonstrated that they would present a danger to the public if armed." *Id.* at 369. So Hardiman concluded that "people who have demonstrated that they are

likely to commit violent crimes have no constitutional right to keep and bear arms." *Id*. The two challengers in that case had very old non-violent disqualifying felony convictions under § 922(g)(1). Hardiman concluded that these two were entitled to an opportunity to show that they no longer belonged in the class of individuals that had historically been excluded from the Second Amendment. In other words, they were entitled to a chance to show that they were no longer at an elevated risk to commit violent crimes. In a resolutely originalist analysis like Hardiman's, intermediate scrutiny can play no role, because the scope of the Second Amendment, once established at the founding, should never be diminished by later judicial interest balancing.[3]

Triggs suggests that the Hardiman concurrence should be informative here, because it cites *Ezell* favorably and it is closely analogous to the Seventh Circuit approach. But I don't see it, at least not as a doctrinal prototype. The Seventh Circuit has consistently held that the historical record is inconclusive, and it has never grounded its Second Amendment analysis of dispossession cases on a theory that certain categories of *people* are outside the scope of the Second Amendment as originally conceived. The Seventh Circuit assumes that even felons have Second Amendment rights, and it evaluates firearm dispossession laws with intermediate scrutiny. (Hardiman's placement of the burden on the challenger has some pragmatic appeal, as I will explain later.)

---

[3] Many courts have tried to explain the doctrinal basis for *Heller*'s conclusion that felon dispossession laws are presumptively constitutional. At one pole are purely historical justifications, such as Hardiman's, and at the other pole are means-end justifications like that in *Skoein*. And there are many variations and combinations of the two types. The lack of consensus is, in large part, explained by the tension between the two polar approaches to Second Amendment analysis.

So I'll follow the *Skoien* approach, and forgo further textual–historical analysis. I will assume that Triggs has rights under the Second Amendment, and evaluate his challenge to § 922(g)(9) under intermediate scrutiny.

## B. Intermediate scrutiny in an as-applied challenge

Using the *Skoien* standard of review, the application of § 922(g)(9) to Triggs is valid only if it is substantially related to an important governmental objective, a standard usually labelled "intermediate scrutiny." As *Skoien* held, the governmental objective with § 922(g)(9) is preventing armed violence, and all agree that that objective is an important one. But two questions remain: (1) does the government have the burden to show that its interest is furthered by applying the ban to Triggs or does Triggs have the burden to show that the interest is not furthered? and (2) regardless who has the burden, how does the court measure whether that burden is met?

In *Skoien*, the court at least implicitly put the burden on the government to show that there was a substantial relationship between § 922(g)(9) and the objective of preventing armed violence. In *Williams*, an as-applied challenge to § 922(g)(1), the Seventh Circuit expressly stated that the burden was on the government: "To pass constitutional muster under intermediate scrutiny, the government has the burden of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." 616 F.3d at 692. The court considered first the general fit between the objective of preventing armed violence and the dispossession of felons by § 922(g)(1). The court readily found that the government had met its burden to show a substantial relationship between the statute and the government's objective. *Williams* also suggested that the burden was on the government to show the substantial relationship between the objective and the dispossession

of the defendant, Williams, specifically. The court concluded that the burden was easily met because of Williams's violent criminal history.

But we should be careful to not read *Williams* too broadly, as though the same test would apply in all Second Amendment challenges. In fact, the *Williams* court stated that it was not "determining that it would be the precise test applicable to all challenges to gun restrictions." *Williams*, 616 F.3d at 692. There is a plausible argument that once the government meets its burden to show that the statute is constitutional on its face, the burden should shift to Triggs to show that it cannot apply to him.

Placing the burden on Triggs is consistent with the approach taken by both the Hardiman concurrence and the lead opinion in *Binderup*. As the lead opinion puts it:

> No doubt a challenger cannot prevail merely on his say-so. Courts must find the facts to determine whether he has adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections. Not only is the burden on the challenger to rebut the presumptive lawfulness of the exclusion at . . . step one, but the challenger's showing must also be strong.

836 F.3d at 347. Likewise in the Hardiman concurrence, which put the burden on challengers to "distinguish themselves and their circumstances from those of persons not entitled to keep and bear arms because of their propensity for violence." *Id*. at 374. The court in *United States v. Chovan*, did not expressly state how it allocated the burdens, but its analysis makes it clear that the burden was on the government to show make a facial showing under intermediate scrutiny, but the burden was on Chovan to show that he, specifically, was unlikely to recidivate. 735 F.3d 1127, 1140 (9th Cir. 2013). These analyses in *Binderup* and *Chovan* do not map perfectly onto the Seventh Circuit's two-step approach. But they support the idea that once the government shows a reasonable fit between the category of persons disposed under

§ 922(g), the government does not have to make yet another particularized showing that the defendant himself is especially dangerous.[4]

But even if the burden remains on the government, that does not mean that the government must present exacting evidence that someone in Triggs's precise circumstances is more likely to commit gun violence in the future. *Williams* makes that clear. In that case, the court held that the government met its burden by showing that the defendant had one prior conviction for robbery, which is "violent by definition" under the law of Indiana, where Williams was convicted. *Williams*, 616 F.3d at 693. The court also noted that Williams beat the robbery victim "so badly that the victim required sixty-five stitches." *Id.*[5] The court concluded: "The fact that Williams was convicted of a violent felony defeats any claim he has that § 922(g)(1) is not substantially related to preventing him from committing further violence." *Id.* The court did not consider the fact that the conviction was more than 20 years old or any other individual circumstance. One conviction for violent conduct was sufficient to meet the government's burden.

---

[4] As other courts have observed, the judicial branch is not institutionally equipped to make this kind of evaluation of the potential for future violence. *See U.S. v. Bean*, 537 U.S. 71, 77 (2002); *Binderup*, 836 F.3d at 350. District judges have to make such predictions in connection with sentencing. But it would be quite another matter to require the district court to engage in standardless, predictive fact-finding as a routine prerequisite to securing a conviction under § 922(g).

[5] It is not clear where this fact comes from. The document the court cited states that Williams was convicted of robbery in 1986, but it does not describe the underlying circumstances. Record on appeal, *United States v. Williams*, No. 09-3175, Dkt. 25-2, at 29. In its appellate brief, the government stated that the victim needed 65 stitches and cited its sentencing memorandum in the district court as support. Brief for Appellee, *United States v. Williams*, No. 09-3175, Dkt. 21, at 31.

The approach taken in *Williams* is consistent with the approach taken in as-applied challenges under the First Amendment. In that context, the Supreme Court has held that the government need only show a relationship between the government's objective and the general circumstances of the challenger. *United States v. Edge Broad. Co.*, 509 U.S. 418, 431 (1993); *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989); *see also Hatfield v. Sessions*, 322 F. Supp. 3d 885, 894 (S.D. Ill. 2018) (evaluating as-applied challenge to § 922(g)(1)).

I will assume for the purpose of Triggs's motion that the government has the burden. But that does not answer the question of what, precisely, must be shown. The parties debate whether the closing statement in *Skoien*, which refers to a "misdemeanant who has been law abiding for an extended period," sets out a required element for an as-applied challenge to § 922(g)(9). I agree with Triggs that the statement is not an element that must be proven. It is, rather, simply the court's reasonable expectation of who might be a plausible as-applied challenger of § 922(g)(9).

Triggs says that the court's task is "to decide whether banning him from possessing his hunting rifles is substantially related to reducing his risk of domestic gun violence." Dkt. 30, at 3. That can't be quite right, because if I decide in Triggs's favor, he would be able possess any firearm for any purpose. More succinctly, Triggs says the question is whether he can be trusted with a firearm. But that is simply too vague a standard. The government does not offer a useful formulation beyond a paraphrase of the intermediate scrutiny standard.

In a case like this one, in which the predicate crimes involve acts of violence, *Williams* strongly suggests that the government will be able to meet its burden under most circumstances. And if there is one point of consensus among the many judicial decisions involving firearm dispossession and the right to bear arms, it is that the demonstrably violent have the least claim

to the benefits of the Second Amendment. In fact, Triggs cites no case in which any court dismissed a charge under the Second Amendment when the defendant had a previous conviction for a violent crime. The reasons to be skeptical of a violent criminal's Second Amendment claim are no less compelling in the context of domestic abuse, which involves harming someone who should be a natural object of affection. *Skoien* left open the possibility for as-applied challenges to § 922(g)(9). But we should expect such challenges to succeed only rarely: unlike § 922(g)(1), the felon dispossession law, § 922(g)(9) by definition includes only those who have a history of violence.

## C. Triggs's as-applied argument

I turn now to Triggs's circumstances. The parties raise three issues related to the question whether § 922(g)(9) is unconstitutional as applied to Triggs: (1) the seriousness of his domestic violence crimes; (2) his general criminal history, including the time since his last significant conviction; and (3) sociological data.

I will consider each issue in turn, but I begin with a preliminary question concerning the evidence that I can consider.

### 1. Evidentiary issues

As I noted above, there is little guidance on the scope of the court's fact-finding authority in the context of a motion to dismiss an indictment. The Federal Rules of Criminal Procedure do not address the issue. The parties have not cited relevant authority that provides a clear standard and the court is not aware of any such authority.

Because most of the evidence at issue involves Triggs's criminal history, it raises the question whether the court must follow the principles articulated in cases such as *Taylor v. United States*, 495 U.S. 575, 600 (1990), and *Mathis v. United States*, 136 S. Ct. 2243, 2252

(2016), which hold that a court may not consider the facts underlying a conviction when considering whether a defendant meets the requirements for a sentencing enhancement under the Armed Career Criminal Act, 18 U.S.C. § 924(e). But neither side contends that the court is so limited and I conclude that it is not. Section 924(e) affects the statutory maximum penalty that certain offenders might face. The Supreme Court has limited fact-finding in that context both as a matter of statutory construction and because of "serious Sixth Amendment concerns." *Mathis*, 136 S. Ct. at 2252. Only a jury, and not a judge, may find the facts that increase a maximum penalty, except for the simple fact of a prior conviction. *Id.* Because Triggs's motion to dismiss does not arise under § 924(e) and does not involve facts that need to be found by the jury, I do not believe that *Taylor* and its progeny are controlling. Regardless, because neither side raises the issue, I conclude that it is forfeited.

The parties address another issue, which is whether the Federal Rules of Evidence apply to Triggs's motion and, if they do apply, whether some of the documents submitted by the government should be excluded as hearsay, particularly the criminal complaints and police reports. The government contends that this is a miscellaneous proceeding to which the rules of evidence do not apply, as provided in Rule 1101(d)(3). Although a hearing on a motion to dismiss an indictment is not listed among the enumerated exceptions, the government says that those are just examples. It contends that a motion to dismiss is similar to a motion to suppress, which is not restricted by the rules. *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Matlock*, 415 U.S. 164, 172–74

(1974) (at suppression hearings, court "should receive the evidence and give it such weight as his judgment and experience counsel").

The analogy to motions to suppress is a reasonable one, but neither side has extensively briefed the question or cited any case law that directly supports its position. *Williams* did not expressly address the question either. But, as discussed above, it is clear that the *Williams* court relied on more than just the prior conviction. The court considered the particular facts underlying the conviction, without discussing whether those facts satisfied the rules of evidence. At least one court of appeals in a similar case considered allegations made to a 911 operator without deciding whether the evidence complied with the federal rules. *Chovan*, 735 F.3d at 1141–42 ("Although Chovan was not arrested for domestic violence, we nonetheless consider the March 2010 domestic abuse call and [his then-wife's contemporaneous] statements."). The court reasoned that the call "supports the conclusions that Chovan is at risk of recidivism for domestic violence and that Chovan might use a gun to commit future domestic violence." *Id.* at 1142. *Skoien*, too, appeared to dig into the record to consider facts outside the conviction itself when the court noted that the defendant had committed his first crime of domestic abuse against his then-wife and his second crime against his new fiancée, relying on this fact to show that there was still a risk of recidivism. 614 F.3d at 645.

What little authority there is seems to support the government's view that I am not restricted to evidence admissible under the Federal Rules of Evidence. And in this case, the government is not asking the court to consider any conduct that didn't result in a conviction. In situations in which Triggs pleaded guilty to a charge, it is reasonable to infer that the allegations in the complaint are accurate, at least in the absence of contrary testimony from Triggs or other evidence. This inference is even more reasonable as to the 2008 domestic

violence conviction because Triggs acknowledged the accuracy of the complaint during his plea hearing. Dkt. 21-2, at 9. So I will consider the circumstances surrounding Triggs's convictions. But I emphasize that, even if only the convictions themselves were admissible, I would reach the same conclusion, that § 922(g)(9) is constitutional as applied to Triggs.

### 2. Triggs's predicate convictions for domestic violence

The 2003 conviction, Dkt. 21-7, involved a drunken confrontation in which Triggs became physical with his then-wife Candy Donoho. Although Donoho testified that her phone was broken because she dropped it, Triggs pleaded guilty to criminal damage to property. Although I find that Donoho testified sincerely as she remembered the incident, I discount her testimony about the phone because it is contradicted by the judgment of conviction. All in all, the interpersonal violence that led to the 2003 conviction is relatively minor. But it is not an isolated incident.

There was no testimony about the 2008 conviction for misdemeanor battery as an act of domestic abuse. Dkt. 21-1. The government submitted the judgment of conviction, Dkt. 21-1, the criminal complaint, Dkt. 21-3, and a transcript of the plea hearing, Dkt. 21-2, at which Triggs agreed that the facts stated in the criminal complaint were substantially accurate. The criminal complaint states that Triggs intentionally caused bodily harm to the victim, as an act of domestic abuse. The criminal complaint also incorporated the incident report of Juneau County sheriff's deputy Aaron Reineking. The report recounted both the victim's and Triggs's versions of the incident. According to the victim, Triggs choked her to the point that she had difficulty breathing; Triggs denied choking or hitting her. Reineking's report also showed that Triggs was originally arrested and charged with criminal damage to property under Wis. Stat.

§ 943.01(1), a misdemeanor, and suffocation/strangulation under Wis. Stat. § 940.235(1), a felony.[6]

Triggs has not adduced any evidence to contradict the complaint or any evidence that would otherwise minimize the conduct underlying his 2008 conviction. And he identifies no basis for his guilty plea other than the choking allegation. I reject Triggs's argument that because the government did not call the victim to testify at the hearing, I should infer that this crime did not involve significant violence. As the original charges show, the 2008 crime could have been a felony.

These two convictions are sufficient on their own to satisfy the government's burden. They show a concerning pattern of violence against women, particularly during times of stress, which is when a cool head is needed most. Although Triggs's convictions did not involve the misuse of firearms, nothing in *Heller*, *Skoien*, or *Williams* suggests that the government needs to make so specific a showing. If it did, then *Skoien* likely would have come out the other way because § 922(g)(9) does not include a requirement that a domestic violence conviction involve a firearm. The conclusion in *Skoien* is that an individual who has engaged in any sort of violent conduct is more likely to commit gun violence. 614 F.3d at 642 ("The belief underpinning § 922(g)(9) is that people who have been convicted of violence once—toward a spouse, child, or domestic partner, no less—are likely to use violence again.").

---

[6] The complaint also states that Triggs was trying to prevent the victim from leaving the home. Twice he grabbed items that she was holding and threw them down the stairs; he threw a box of hamburger patties at her but missed and broke a window instead; he broke another window when he confronted the victim while she was trying to remove items from the freezer; he spit on her face; he threw a telephone; and he damaged the wall with a candle holder. Dkt. 21-3.

Triggs's situation is similar to that of the defendant in *Skoien*, who also had two domestic violence misdemeanor convictions. 614 F.3d at 645. In rejecting the defendant's as-applied challenge in that case, the court of appeals emphasized that he was a "recidivist." *Id.* The court did not even consider as relevant the specific nature of the predicate offenses, which the court never mentioned. But the presentence report filed in the district court shows that one conviction involved the defendant pushing the victim when he was intoxicated; the other conviction also involved the defendant pushing the victim, who then hit her head. *United States v. Skoien*, No. 08-cr-12-bbc, Dkt. 20, at 14–15. Collectively, this conduct is no more severe than the conduct at issue in this case.

Triggs is correct that he has not had a conviction for domestic violence since 2008, which distinguishes him from the defendant in *Skoien*. But Triggs's reliance on that fact is misplaced for two reasons. First, going several years without conviction does not on its own render a firearm prohibition unconstitutional. As noted above, the predicate offense in *Williams* was more than 20 years old. Second, nothing in *Skoien* supports a conclusion that a time period similar to the one in this case is so significant that it renders application of § 922(g)(9) unconstitutional. *Skoien* considered the question whether it was appropriate to create a permanent ban on firearm possession because of a domestic abuse conviction. The argument was that

> the propensity for violence declines with advancing age, and people who are not convicted of additional offenses have demonstrated that they no longer pose risks to other members of their households. Applying § 922(g)(9) to older persons who have not been in legal trouble for many years cannot be substantially related to an important governmental objective, the argument concludes.

*Id.* at 644. The relevant time period in this case is at most 10 years. I do not believe that it would be accurate to say that Triggs is at such an "advanc[ed] age" (he was born in 1980) or that so much time has passed since his last domestic abuse conviction that the justifications cited by the court in *Skoien* no longer apply. This is simply not one of the few cases contemplated in *Skoien* and *Williams* in which the defendant's convictions are so old or so minor that the government can no longer show that there is a substantial relationship between its interest in preventing gun violence and its enforcement of § 922(g)(9).

### 3. Triggs's general criminal history

The government has submitted judgments of convictions for several other crimes: (1) operating while intoxicated (2012); (2) issuing worthless checks (2009); (3) bail jumping (2008); (4) disorderly conduct (2007); and (5) bail jumping (2003). Dkt. 21.[7] The government also submitted a new criminal complaint from 2015 for disorderly conduct and criminal damage to property. The online docket for that case shows that he pleaded guilty to a count of disorderly conduct and the criminal damage charge was dismissed but read in, which means that that conduct could be considered in sentencing.

The convictions themselves show that Triggs has a significant criminal history that continues to almost the present. Some of the convictions are for inherently disruptive and dangerous conduct. And because he was intoxicated when he committed at least one of his domestic violence misdemeanors, his relatively recent OWI conviction is particularly troubling. Lawrence Greenfield, Bureau of Justice Statistics, U.S. Department of Justice, *Alcohol and Crime* 3 (1998) ("Among victims of violence who were able to describe the offender's use of drugs or

---

[7] Wisconsin's online docket shows three additional convictions for operating while revoked in 2008 and 2009. Nos. 2009CT24, 2008CT56, and 2007CT308.

alcohol, about two-thirds in an intimate relationship with the offender reported the offender's drinking at the time of the crime.").

The facts underlying some of Triggs's other convictions also raise red flags. The complaint for his 2007 disorderly conduct conviction states that Triggs punched his girlfriend's sister after calling her a "fucking dike bitch." Dkt. 21-12. Triggs admitted to the investigating officer that he called the victim "inappropriate names," that there was "pushing and shoving going on," and that he grabbed [the victim's] face." *Id.*

In 2015, Triggs got involved in an angry confrontation over what appears to be a minor parking issue, which led to another conviction for disorderly conduct. The complaint states that a woman who parked on a public street near Triggs's house discovered when she returned that her car was now blocked by another car and there was "a long distinct key mark down the right side of her vehicle." Dkt. 21-16. After learning that Triggs was blocking her, she asked him to move his car. In response, Triggs "was verbally abusive towards her, calling her a 'c***' and swearing at her about parking in his 'spot' on the public street." *Id.* (There is no dispute that Triggs did not have a right to prevent others from parking on the street.) Two weeks earlier, Triggs had left a note on the woman's car, telling her to "stop parking in my fucking spot." Triggs admitted to the investigating officer that he had a "verbal confrontation" with the woman and that he left the note for her. *Id.* The complaint is consistent with the testimony of the investigating officer, who appeared at this court's evidentiary hearing. Triggs was not convicted of criminal damage to property for keying the car, but that charge was read in at sentencing.

These other convictions provide additional support for the conclusion that there is a substantial relationship between the government's interest in preventing gun violence and the

application of § 922(g)(9) to Triggs. Triggs is not public-enemy number one, but his domestic violence convictions are not aberrations in an otherwise law-abiding life. In other words, he cannot say that he has been "law abiding for an extended period." *Skoien*, 614 F.3d at 645. Triggs was, and remains, a hot-head. He cannot point to his criminal history to show that he no longer belongs in the category of misdemeanants who have demonstrated, by their actions, an increased risk of gun violence.

### 4. The social science evidence

I turn finally to the social science evidence. The gist of Triggs's argument is that sociological data suggests that rifle owners in the Midwest are relatively unlikely to engage in gun violence or other crimes. But the fact that rifle owners or Midwesterners may be statistically less likely to commit crimes as a general matter has little or no probative value in determining Triggs's own propensity for gun violence. His own conduct is much more informative.

Regardless, I am disinclined to credit Triggs's analysis of the sociological literature without expert guidance. Those studies, which the Seventh Circuit cited and relied on in *Skoien*, suggest generally that those convicted of misdemeanor crimes of domestic violence are at an elevated risk to commit violent crimes. But Triggs cherry-picks particular details from these studies to show that Triggs's circumstances make it less likely that he would commit a violent crime. For example, Triggs cites one study for the notion that "rifle possession in the home . . . [was] associated with a 20% reduction in the risk of domestic homicide." Dkt. 23 at 8. But I cannot tell without expert assistance whether the particular findings that Triggs cites are statistically significant, or even if the studies that Triggs relies on are reliable. I am not persuaded that rifle-owning Midwesterners with domestic violence convictions are, unlike

domestic violence misdemeanants generally, less likely to commit gun violence than the general public.

## CONCLUSION

Triggs's motion raises difficult questions about the standards applicable to as-applied Second Amendment challenges to firearm dispossession laws. But the law at issue here, 18 U.S.C. § 922(g)(9), dispossesses only those who have been convicted of crimes that involve acts of violence. Because § 922(g)(9) is drawn so narrowly, as-applied challenges will succeed rarely, only when the challenger has crimes that were minor, or long past, or probably both. Triggs's criminal history makes him a poor challenger, even though his long list of crimes includes no felonies. The Second Amendment does not require that Triggs be allowed to possess firearms.

## ORDER

IT IS ORDERED that defendant Robert Triggs's motion to dismiss the indictment, Dkt. 15, is DENIED.

Entered November 2, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge